## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TERRAYLN MONIQUE DIAMOND,

      Plaintiff,

    v.

EXPERIAN INFORMATION SOLUTIONS, INC.,
TRANSUNION, LLC,
RENTGROW, INC. and
TT MARKETING, INC.,

      Defendants.

Civil Action No. TDC-23-3508

### MEMORANDUM OPINION

Plaintiff Terralyn Monique Diamond has filed this civil action against Defendants Experian Information Solutions, Inc. ("Experian"), TransUnion, LLC ("TransUnion"), RentGrow, Inc. ("RentGrow"), and TT Marketing, Inc. ("TT Marketing"), in which she alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x (2018), and the Fair Debt Collections Practices Act ("FDCPA"), 15 U.S.C. §§ 1692–1692p. TT Marketing has filed a Motion to Dismiss for Lack of Personal Jurisdiction, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED.

### BACKGROUND

On April 11, 2020, Diamond terminated a lease agreement that she had made with Point South and Bridge Hollow Apartments ("the Apartments") for a rental unit in Austin, Texas. On April 17, 2020, Diamond received an account statement that listed a charge related to her lease

cancellation, which Diamond claims to have paid in full that same day. In May 2020, the Apartments either retained Defendant TT Marketing to collect the allegedly unpaid balance or sold the rights to its account with Diamond to TT Marketing. TT Marketing alleges, and Diamond does not dispute, that the account listed an address in San Antonio, Texas as Diamond's current address at the time that TT Marketing received the account.

TT Marketing began reporting Diamond's account to credit reporting agencies as having a past-due balance and listed the alleged debt as a "charge off," which is a designation that creditors use when they deem payment to be "unlikely." *See* Md. Rule 3–306(a)(1) (defining a "charge-off"). On October 9, 2020, Diamond sent a one-page fax to TT Marketing that requested verification that there was a valid basis for the debt and listed a return address in Austin, Texas. That same day, TT Marketing sent an email response to Diamond acknowledging receipt of the fax and requesting that Diamond submit a formal dispute by mail. Diamond sent an email in reply that threatened legal action if TT Marketing did not provide her with proper validation of the debt.

From September 2020 forward, Diamond contacted various credit reporting agencies to dispute the information as inaccurate. TT Marketing alleges, and Diamond does not dispute, that it received a series of Automated Consumer Dispute Verification ("ACDV") forms and accompanying documentation from credit reporting agencies that listed different addresses for Diamond. According to TT Marketing, the first ACDV form it received listed for Diamond an address in San Diego, California, and the second ACDV form listed an address in Chicago, Illinois. After receiving the second ACDV form with the Illinois address, TT Marketing transferred Diamond's account to another debt collection agency, Transworld Systems, Inc. ("TSI"), because TT Marketing does not conduct business in Illinois. After this transfer, TT Marketing received a third ACDV form that listed an address for Diamond in Temple Hills, Maryland. On May 25,

2

2021, TT Marketing sent a letter to Diamond at the Maryland address stating that her account had been referred to a different collection agency and providing her with the contact information for TSI.

Diamond continued to dispute the information about the alleged debt in communications with Experian, TransUnion, and RentGrow (collectively, "the Credit Reporting Agencies"). The disputes identified by Diamond as relevant to this case were submitted to Experian and TransUnion in February 2023 and to RentGrow in October 2023. Among other materials, Diamond submitted to the Credit Reporting Agencies copies of her Maryland driver's license, the final account statement she received from the Apartments, and confirmation of her payment to the Apartments.

On December 27, 2023, Diamond filed the present case. In the currently operative Amended Complaint, Diamond alleges in Count 1 a violation of the FCRA based on the Credit Reporting Agencies' failure to follow reasonable procedures to ensure maximum possible accuracy in preparing Diamond's credit report, conduct a reasonable investigation into Diamond's dispute, and maintain reasonable procedures by which to verify the disputed information. Count 2 alleges that TT Marketing violated the FCRA by failing to investigate properly the dispute, to review all relevant information regarding the dispute, and to correct the information that it provided to the Credit Reporting Agencies. Count 3 asserts that through its activities relating to Diamond's account, TT Marketing violated the FDCPA by using false, deceptive, or misleading representations in connection with the collection of a debt; using unfair or unconscionable means of collection; and engaging in conduct the natural consequence of which is to harass, oppress, or abuse a person.

On April 10, 2024, TT Marketing filed its Motion to Dismiss for Lack of Personal Jurisdiction. At the request of the Court, TT Marketing supplemented the record with copies of some of the correspondence and other documents referenced in the Motion.

3

## DISCUSSION

In the Motion to Dismiss, TT Marketing seeks dismissal for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) on the grounds the Court lacks general or specific personal jurisdiction because it lacks contacts with Maryland and has not purposely availed itself of the privilege of doing business in Maryland. In opposing the Motion, Diamond does not claim that Defendants are subject to general jurisdiction in Maryland but instead primarily argues that specific jurisdiction exists because she experienced the effects of TT Marketing's conduct in Maryland.

## I.     Legal Standard

Under Federal Rule of Civil Procedure 12(b)(2), it is the plaintiff's burden to establish personal jurisdiction. *See Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir. 1993). When a court decides a Rule 12(b)(2) motion without an evidentiary hearing, the plaintiff need only make a *prima facie* showing that a defendant is properly subject to the court's jurisdiction. *Id.*; *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In evaluating the plaintiff's showing, a court must accept the plaintiff's allegations as true, and it must draw all reasonable inferences and resolve any factual conflicts in the plaintiff's favor. *Mylan Labs., Inc.*, 2 F.3d at 59-60. The court may consider affidavits and other submitted evidence in resolving a Rule 12(b)(2) motion. *See CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 763-64 (D. Md. 2009).

Under Rule 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). A district court's exercise of personal jurisdiction over a non-resident defendant must satisfy both the long-arm statute of the state in which the court sits and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.*

4

The Maryland long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6–103 (West 2020), authorizes the exercise of personal jurisdiction to the limits permitted by the Due Process Clause of the Fourteenth Amendment. *See ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 710 (4th Cir. 2002); *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 878 A.2d 567, 576 (Md. 2005). There may be cases, however, in which personal jurisdiction comports with federal due process but which present factual scenarios outside the scope of the long-arm statute. *Krashes v. White*, 341 A.2d 798, 804 (Md. 1975). Thus, the jurisdictional analysis under the long-arm statute does not simply collapse into the due process analysis. *See Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 493 n.6 (Md. 2006) (stating that although the "long arm statute is coextensive with the limits of personal jurisdiction set by the due process clause," it is not "permissible to . . . dispense with analysis under the long-arm statute"). However, because TT Marketing primarily argues that "the exercise of personal jurisdiction offends the due process guarantee of the Fourteenth Amendment," Mot. ¶ 43, ECF No. 53, the Court will begin its analysis by addressing the due process requirement.

## II.    Due Process

Under the Due Process Clause of the Fourteenth Amendment, personal jurisdiction may be exercised over a party upon a showing that the party has sufficient "minimum contacts" with the forum state such that "maintenance of the suit [in the state] does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). In assessing the presence of minimum contacts, courts distinguish between two types of personal jurisdiction: general and specific. Because TT Marketing argues, and Diamond does not dispute, that there is no basis for general jurisdiction, the Court's analysis will be limited to whether specific jurisdiction in Maryland is available.

5

Specific jurisdiction provides authority "over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). For a court to exercise specific jurisdiction over a defendant, the defendant must "purposefully avail[] itself of the privilege of conducting activities within the forum State," and its "conduct and connection with the forum State" must be "such that [it] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). The Court determines whether it has specific jurisdiction over an entity by considering "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009) (quoting *ALS Scan, Inc.*, 293 F.3d at 712). It is necessary to evaluate the second and third prongs of the test for specific jurisdiction "[i]f, and only if" the first prong is satisfied. *Id.*

## A. Purposeful Availment

The United States Court of Appeals for the Fourth Circuit has noted that the purposeful availment inquiry "is not susceptible to a mechanical application" and has identified a list of non-exclusive factors to be considered in the analysis:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) (quoting *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 198-99 (4th Cir. 2018)). The focus should

6

be on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). In assessing purposeful availment, courts consider "the *quality* and *nature* of the defendant's connections" to the forum state, "not merely the number of contacts between the defendant and the forum state." *UMG Recordings, Inc.*, 963 F.3d at 352.

Here, the quality and nature of TT Marketing's contacts with Maryland do not establish purposeful availment. As to the first four factors, TT Marketing does not maintain any offices, agents, or property in the state of Maryland. It did not and does not seek to solicit or initiate any business in the state or engage in significant or long-term business activities in Maryland; indeed, it conducts no marketing or advertising directed to Maryland residents and does not even use the internet, whether through an interactive website or otherwise, to solicit business from Maryland residents. As to the fifth and seventh factors, Diamond does not allege that there is a Maryland choice-of-law provision in any contract applicable to this case, or that there was a contract requiring the performance of any activities in Maryland.

As for the sixth and eighth factors, there is no allegation that any of TT Marketing's three Texas-based employees ever made in-person contact with Diamond. Rather, there were only two contacts with Diamond initiated by TT Marketing. The first consisted of an email sent on October 9, 2020 in response to a fax received from Diamond in which Diamond listed her address as a location in Texas. The second consisted of the May 25, 2021 letter sent to Diamond at her Maryland address, but that letter informed her that TT Marketing had transferred her account to a different third-party collection agency, TSI, and directed her to contact TSI going forward. The transfer to TSI was specifically because Diamond had by then provided addresses in Illinois and Maryland, and TT Marketing does not conduct business in those states. Although this letter

7

constitutes a contact with Diamond while she was in Maryland, it would be improper to find that TT Marketing purposefully availed itself of this forum—such that it is subject to specific jurisdiction in Maryland—based on a letter sent to Diamond to notify her of the action it took to avoid creating contacts with the state or conducting business there. Under these circumstances, the Court finds that "the nature, quality, and extent of the parties' communications about the business being transacted" does not support a finding of purposeful availment. *UMG Recordings, Inc.*, 963 F.3d at 352. When all of the factors are considered, the Court concludes that TT Marketing did not purposely avail itself of the privilege of conducting business in Maryland as required to warrant this Court's exercise of personal jurisdiction over it.

### B. "Effects Test"

Where the record is clear that there is insufficient evidence of purposeful availment, Diamond primarily argues that the Court should find personal jurisdiction based on the "effects test." Opp'n at 1, ECF No. 54. This theory of personal jurisdiction derives from *Calder v. Jones*, 465 U.S. 783 (1984), in which the United States Supreme Court held that, in a libel action based on a National Enquirer article impugning the professionalism of an entertainer who worked in California, there was personal jurisdiction in California over the National Enquirer, based on the "effects" of their out-of-state publication in California, because the article was based on California sources, the harm to the plaintiff and her professional reputation "was suffered in California," and the National Enquirer, whose largest circulation was in California, "knew that the brunt" of the harm would be felt there. *Id.* at 788-90. Based on *Calder*, a court may " exercise specific personal jurisdiction over a nonresident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that that conduct would cause harm to a forum resident." *Carefirst*, 334 F.3d at 397-98. To establish personal jurisdiction

8

on this basis, the plaintiff must show that: "(1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity." *Consulting Eng'rs Corp*, 561 F.3d at 280 (quoting *Carefirst*, 334 F.3d at 398 n.7).

Here, Diamond argues that the Court should exercise personal jurisdiction based on the "effects test" because TT Marketing "intentionally directed its tortious conduct (inaccurate credit reporting) toward Maryland, knowing it would cause harm to Plaintiff, a resident of Maryland." Opp'n at 1. Specifically, she alleges that: (1) TT Marketing's inaccurate reporting in 2023 constitutes an intentional tort; (2) the harms to her credit were felt by her in Maryland; and (3) TT Marketing aimed its tortious conduct at Maryland by using its credit reporting as a tool to force payment from her. *Id*. at 9-11.

Diamond's argument fails for several reasons. First, although she focuses on the effects of TT Marketing's conduct on her in Maryland, the effects test "does not supplant the minimum contacts analysis, but rather informs it." *Consulting Eng'rs Corp.,* 561 F.3d at 280. "Although the place where the plaintiff feels the alleged injury is plainly relevant" to the jurisdictional inquiry, "it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld." *Id.* at 280-81 (quoting *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997)). "[T]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290. Here, as discussed above, TT Marketing did not initiate any contacts with Maryland with the exception of the letter sent to Diamond to direct her to the successor debt collection agency. As for the conduct specifically identified by Diamond,

TT Marketing's reporting of allegedly false information to credit reporting agencies located outside Maryland did not meaningfully connect TT Marketing to Maryland.

Second, upon consideration of the specific elements of the effects test, the Court finds that it does not provide a basis for personal jurisdiction. In particular, the record does not support the conclusion that, as required for the third element, TT Marketing "expressly aimed" its conduct at Maryland such that it is "the focal point of the tortious activity." *Consulting Eng'rs Corp.*, 561 F.3d at 280. Unlike in *Calder*, in which the National Enquirer had its largest circulation in California and thus sent numerous copies of its publication into California, relied on sources in California to write the story, and knew that the allegedly libelous story would have a significant impact in California because the subject of that story had a professional career in California, TT Marketing cannot be deemed to have "expressly aimed" its conduct at Maryland where its allegedly false reports related to an alleged debt that arose in Texas, were sent to credit reporting agencies not located in Maryland, and related to an individual, Diamond, whose address at the outset of the activity was in Texas. Where it has not been established that TT Marketing even knew that Diamond had a Maryland address until after the transfer of the account occurred, Maryland cannot be deemed to be "the focal point of the tortious activity." *Consulting Eng'rs Corp.*, 561 F.3d at 280.

In *Young v. New Haven Advocate*, 315 F.3d 256 (4th Cir. 2002), the United States Court of Appeals for the Fourth Circuit considered *Calder* but found a lack of personal jurisdiction in Virginia over out-of-state newspapers where the plaintiff had claimed that they had knowledge that the publication of "defamatory articles, which were available to Virginia residents on the Internet, would expose [the plaintiff] to public hatred, contempt, and ridicule in Virginia, where he lived and worked." *Id.* at 262. The court held that "something more than posting and

accessibility is needed to indicate that [the newspapers] had "purposefully (albeit electronically) directed [their] activity in a substantial way" to Virginia. *Id.* at 263 (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998)). Under this same principle, the Court finds that there is nothing inherent in the act of reporting to credit reporting agencies an alleged debt that arose from events in Texas that could support the conclusion that TT Marketing sought to direct its activity to Maryland.

Indeed, judges in this District have held that merely reporting inaccurate information to a credit reporting agency about a Maryland resident is insufficient to confer personal jurisdiction. *See Screen v. Equifax Info. Sys., LLC*, 303 F. Supp. 2d 685, 690 (D. Md. 2004); *Alston v. Resurgent Cap. Servs., L.P.*, No. DLB-23-1176, 2023 WL 8934025, at \*3 n.1 (D. Md. Dec. 27, 2023). In *Screen*, the court contrasted *Rivera v. Bank One*, 145 F.R.D. 614 (D.P.R. 1993), upon which Diamond primarily relies, and found that the evidence before it was "plainly insufficient" to establish personal jurisdiction where it showed "only that [the defendant] was aware of plaintiff's Maryland address when verifying the negative and inaccurate information . . . causing harm to the plaintiff in Maryland." *Screen*, 303 F. Supp. 2d 685 at 690. The same is true here. TT Marketing's allegedly false reports to the Credit Reporting Agencies, even if made with the knowledge that Diamond had become a Maryland resident at some point, does not establish personal jurisdiction. *See id.* Although Diamond claims that TT Marketing was attempting to "coerce payment" from her, Opp'n at 10, the only such conduct alleged in the Amended Complaint consists of the same conduct—the continued reporting of the same alleged debt to the Credit Reporting Agencies. *See* Am. Compl. ¶¶ 148-150, ECF No. 45. Thus, consistent with this case law, the Court finds that, absent more, a nonresident defendant's reporting or accessing of credit information about a Maryland resident is too attenuated a connection to the forum to establish jurisdiction and risks

"improperly attribut[ing] a plaintiff's forum connections to the defendant and mak[ing] those connections 'decisive' in the jurisdictional analysis." *Cole v. Cap. One*, No. GJH-15-1121, 2016 WL 2621950, at *3 (D. Md. May 5, 2016) (quoting *Walden*, 571 U.S. at 285) (declining to find personal jurisdiction based on the fact that the defendant impermissibly accessed the credit report of the plaintiff, who was a Maryland resident); *see Alston*, 2023 WL 8934025, at *3 n.1.

In summary, even if TT Marketing's conduct may have had effects on Diamond in Maryland, because TT Marketing's conduct was not expressly aimed at Maryland, and TT Marketing did not purposefully avail itself of the privilege of conducting activities in this state, the Court finds that, under the Due Process Clause, TT Marketing did not have sufficient minimum contacts with this forum to warrant the exercise personal jurisdiction. The Court will therefore grant the Motion to Dismiss and need not engage in further analysis relating to either the Due Process Clause or the Maryland long-arm statute. *See Consulting Eng'rs Corp.*, 561 F.3d at 278.

## CONCLUSION

For the foregoing reasons, TT Marketing's Motion to Dismiss will be GRANTED. A separate Order shall issue.

Date:  July 22, 2024

THEODORE D. CHUANG
United States District Judge